USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/27/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GRANITE STATE INSURANCE COMPANY,

                Plaintiff,

        -against-

RAINIER ARMS LLC,

                Defendant.

---

23-CV-07644 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Defendant Rainier Arms LLC is a firearms retailer and Plaintiff Granite State Insurance Company is its business insurer. Plaintiff brought this action seeking declaratory judgment that it is not required to defend or indemnify Defendant in three lawsuits pending in federal courts in New York. Before the Court are the parties' cross-motions for partial summary judgment on the duty to defend.

For the reasons set forth below, Plaintiff's motion for partial summary judgment is GRANTED, and Defendant's cross-motion for partial summary judgment is DENIED. Additionally, Defendant's request for attorneys' fees is DENIED.

## FACTS AND PROCEDURAL HISTORY[1]

### I.  The Ghost Gun Lawsuits

Defendant Rainier Arms LLC ("Rainier" or "Defendant"), a Washington-state-based gun retailer that sells firearms and firearm parts, is a defendant in several lawsuits in New York for its

---

[1] Unless otherwise indicated, the following facts are drawn primarily from the parties' Local Civil Rule 56.1 Statements (Dkt. No. 43 ("Granite 56.1 Stmt."); Dkt. No. 46-2 ("Rainier 56.1 Stmt."); Dkt. No. 51 ("Granite Reply 56.1 Stmt.")), and the exhibits filed by the parties in connection with those Statements, including an exemplar insurance policy and the operative complaints in the underlying lawsuits. Unless otherwise noted, where only one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

alleged involvement in the sales of unfinished firearms, receivers, and frames that can be used to assemble so-called "ghost guns"—guns that lack serial numbers, registration, or other traditional means of tracing firearms (collectively, the "Ghost Gun Lawsuits"). *See* Answer to Amended Complaint, Affirmative Defenses, and Counterclaims, Dkt. No. 39 ¶ 1 ("Answer & Counterclaims"); Dkt. No. 46-1 ("Def.'s Br.") at 1. The Ghost Gun Lawsuits were filed in 2022 by the New York Attorney General's Office, the City of Buffalo, and the City of Rochester against Rainier and other firearms manufacturers and retailers (hereinafter, the "Ghost Gun Defendants"), in state court in New York County, Erie County, and Monroe County, respectively. Each action was subsequently removed to federal court, and the latter two actions were consolidated in the District Court for the Western District of New York. *See People of the State of New York v. Arm or Ally, LLC et al.*, No. 22-cv-06124 (S.D.N.Y.) ("NYAG Lawsuit"); *City of Buffalo v. Smith & Wesson Brands, Inc. et al.*, No. 23-cv-00066 (W.D.N.Y.) ("Buffalo Lawsuit"); and *City of Rochester v. Smith & Wesson Brands, Inc. et al.*, No. 23-cv-06061 (W.D.N.Y.) ("Rochester Lawsuit").

The Ghost Gun Lawsuits all contain similar allegations, and the complaints allege, *inter alia*, that the Ghost Gun Defendants, including Rainier, marketed and sold "unfinished" and un-serialized frames and receivers that constitute the core part of a handgun, rifle, or shotgun, but that are missing a few drill holes and contain a small amount of extra plastic, such that they are "easily convertible into the finished product, a deadly weapon, sometime called a privately made firearm or a ghost gun," and that "[o]nce completed, there is no meaningful difference between the [d]efendants' products and a frame or receiver one could buy at a gun store." *See* Dkt. No. 44-1 (the "NYAG Complaint") ¶¶ 1–3, 19–23; *accord* Dkt. No. 44-2 (the "Buffalo Complaint") ¶¶ 228–29, 234; Dkt. No. 44-3 (the "Rochester Complaint") ¶¶ 237–38, 243. The complaints

allege that "[t]he difference between an unfinished frame and a serialized frame is negligible, as is the effort required to convert the former into the latter," and that the Ghost Gun Defendants "have made ease of conversion a key part of their marketing to both create a market for unfinished frames and receivers broadly and become industry leaders in that niche."  NYAG Complaint ¶¶ 34, 40; *accord* Buffalo Complaint ¶¶ 247, 254; Rochester Complaint ¶¶ 256, 263.

The complaints further allege that, although the unfinished receivers fall within the federal definition of a "firearm" and although numerous federal, state, and local laws apply to the products sold by the Ghost Gun Defendants, the Ghost Gun Defendants have tried to subvert those state and federal laws.[2]  *See* NYAG Complaint ¶¶ 3, 79, 81, 96–105; Buffalo Complaint ¶¶ 25, 231–47, 266–74; Rochester Complaint ¶¶ 35, 235–56, 275–83.  For instance, "based on the fiction that [d]efendants' unfinished frames or receivers fall outside the federal definition of a 'firearm,' under 18 U.S.C. § 921, [d]efendants have sold them directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns," and that are "designed to protect New Yorkers' rights to public health and safety."  NYAG Complaint ¶¶ 3, 27; *see also* NYAG Complaint ¶¶ 89–105; Buffalo Complaint ¶¶ 231–43; Rochester Complaint ¶¶ 240–52.  These laws and regulations require, among other things, "conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source if used in a crime."  NYAG Complaint ¶ 27.  Per the complaints, such laws and regulations, *inter alia*, help to "keep guns out of the hands of

---

[2] Shortly before the issuance of this Opinion, the Supreme Court upheld the facial validity of the ghost gun regulations issued in 2022 by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), as consistent with ATF's authority under the Gun Control Act of 1968.  *See Bondi v. Vanderstock*, 604 U.S. _____ (2025).

dangerous persons" and to "mitigate or solve crimes committed with firearms." *Id.* ¶¶ 73–74; *see also id.* ¶¶ 97–98; Buffalo Complaint ¶¶ 266–74; Rochester Complaint ¶¶ 275–83.

The complaints also contain allegations about the target market for the Ghost Gun Defendants products. The Buffalo and Rochester Complaints allege, for example, that "[i]n many cases, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children — anyone barred by law from acquiring guns." Buffalo Complaint ¶ 34; Rochester Complaint ¶ 33; *see also* NYAG Complaint ¶¶ 27, 29, 33. Additionally, the Ghost Gun Defendants have allegedly marketed the products as "designed to evade federal gun laws" and have misled customers into believing that the products are permissible workarounds to applicable laws and regulations. *See* NYAG Complaint ¶¶ 81, 111–14; Buffalo Complaint ¶¶ 36, 40, 231–47; Rochester Complaint ¶¶ 35, 39, 240–56.

As to the consequences of this alleged conduct, the complaints allege that New York has faced a public health and safety crisis caused by gun violence and gun crime, due in significant part to the influx of untraceable ghost guns, and that the Ghost Gun Defendants have contributed to the crisis. *See, e.g.,* NYAG Complaint ¶¶ 1, 54–55, 543 ("Rainier Arms' business practices have increased the number of dangerous ghost guns present in [New York]."); Buffalo Complaint ¶¶ 275–92; Rochester Complaint ¶¶ 284–300. The complaints allege various ongoing harms and costs to the plaintiffs, such as the expenditure of law enforcement efforts and other state and local government resources. *See* NYAG Complaint ¶ 66; Buffalo Complaint ¶¶ 456–58; Rochester Complaint ¶¶ 464–66. Plaintiffs allege that the abatement of the health and safety crisis has required and will require extensive additional resources for which the Ghost Gun

4

Defendants should be held responsible, such as costs to locate and recover unfinished frames and receivers or the ghost guns made from those products, trace un-serialized firearms used in the commission of crimes, and support communities that have been harmed by gun violence and crime.  *See* NYAG Complaint ¶¶ 67–69; Buffalo Complaint ¶¶ 456–58; Rochester Complaint ¶¶ 464–66.

The NYAG Complaint asserts claims for (i) repeated and persistent illegal conduct in violation of N.Y. Executive Law § 63(12); (ii) repeated and persistent fraudulent conduct in violation of N.Y. Executive Law § 63(12); (iii) public nuisance pursuant to N.Y. General Business Law § 898-c; (iv) deceptive acts and practices in violation of N.Y. General Business Law § 349; (v) false advertising in violation of N.Y. General Business Law § 350; (vi) negligence *per se*; and (vii) negligent entrustment.  NYAG Complaint ¶¶ 596–634.  The Buffalo Complaint and the Rochester Complaint assert claims for (i) violations of N.Y. General Business Law § 898 (a–e); (ii) common law public nuisance; (iii) deceptive business practices in violation of N.Y. General Business Law § 349; and (iv) deceptive business practices in violation of N.Y. General Business Law § 350.  Buffalo Complaint ¶¶ 505–73; Rochester Complaint ¶¶ 511–79. All three complaints seek injunctive and monetary relief.

## II.    The Insurance Action

Plaintiff Granite State Insurance Company ("Granite" or "Plaintiff") is Rainier's insurer and issued fourteen Commercial General Liability insurance policies to Rainier effective each year between October 3, 2008, and October 3, 2022.  Granite 56.1 Stmt. ¶ 4.  The parties have agreed that one such insurance policy, effective October 3, 2021, to October 3, 2022, *see* Dkt. Nos. 44-4–44-10 (hereinafter, the "Exemplar Policy"), is "representative of the relevant policy

terms for all of the other policies named in the complaint for the purpose of the issues raised by [Granite's instant motion for summary judgment]."  Granite Reply 56.1 Stmt. ¶¶ 5–6 & Ex. A.

In July 2022, Rainier tendered a notice of claim with respect to the NYAG Lawsuit, which was filed on June 29, 2022.  *See* Rainier 56.1 Stmt. ¶ 6;[3] Dkt. No. 46-4.  It also tendered notices of claim with respect to the Buffalo and Rochester Lawsuits.  *See* Dkt. No. 44 ¶¶ 9–10. On August 29, 2023, Plaintiff's claims administrator sent Rainier three separate letters disclaiming coverage under the fourteen policies as to any of the Ghost Gun Lawsuits.  Rainier 56.1 Stmt. ¶¶ 7–9; Dkt. Nos. 46-5–46-7.  Among other reasons, the letters proffered that Granite disclaimed coverage because the Ghost Gun Lawsuits did not allege "damages **because of** 'bodily injury' or 'property damage'" under the section of the policies titled "Coverage A – Bodily Injury and Property Damage Liability"; did not allege that such damages were "caused by an 'occurrence,'" as is required by that section; and that the damages sought in the Ghost Gun Lawsuits did not qualify as damages within the meaning of the policies.  *See* Dkt. Nos. 46-5 at 4–6; 46-6 at 4–6; 46-7 at 4–6 (boldface in original).

In this action, Granite seeks a declaratory judgment that it is not required to defend (Count I) or indemnify (Count II) Rainier in the Ghost Gun Lawsuits.  *See* Am. Compl., Dkt. No. 38.  Rainier has counterclaimed for breach of the Granite insurance contracts based on Granite's refusal to pay Rainier's defense costs in the Ghost Gun Lawsuits (Count I), for declaratory judgment that Granite must fund Rainier's defense in the Ghost Gun Lawsuits (Count II), and for breach of the duty of good faith and fair dealing in refusing to extend coverage to Rainier with respect to the Ghost Gun Lawsuits (Count III).  *See* Answer & Counterclaims.

---

[3] Rainier's Rule 56.1 Statement includes two paragraphs labeled as Paragraph 6.  This citation refers to the paragraph that appears on page 4, under the heading, "Additional Statement of Undisputed Material Facts."

On February 16, 2024, Plaintiff filed a motion for partial summary judgment on Count I of its Amended Complaint and Counts I and II of Defendant's Counterclaims, seeking declaratory judgment that it does not owe a duty to defend Defendant in the Ghost Gun Lawsuits. *See* Dkt. No. 41; Dkt. No. 42 ("Pl.'s Br."). On March 18, 2024, Defendant opposed Plaintiff's motion and filed a cross-motion for partial summary judgment, seeking an order denying Plaintiff's motion and granting Defendant's cross-motion "on Count I declaring that Plaintiff owes Rainier a duty to defend." Dkt. No. 46; *see also* Def.'s Br. On April 12, 2024, Plaintiff filed a consolidated reply brief and brief in opposition to Defendant's cross-motion, which was the final brief filed on the parties' motions. Reply Mem., Dkt. No. 50 ("Reply").

## LEGAL STANDARDS

### I.    The Legal Standard on Summary Judgment

A court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the materials that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The standard is the same for cross-motions for summary judgment; the court must consider each motion independently of the other and, when evaluating each, must consider the facts in the light most favorable to the non-moving party. *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

The court must resolve ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). "However, the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 254 (internal references omitted) (quoting *Anderson*, 477 U.S. at 252).

## II.    Choice of Law

A threshold inquiry is the choice of law that applies to this dispute.  Plaintiff argued that the law of Washington state applies; Defendant has not argued that any other jurisdiction's law applies, and as explained below, it has implicitly agreed in its brief that Washington law applies.

Federal courts sitting in diversity jurisdiction must follow the choice-of-law rules of the state in which they sit (here, New York).  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Under New York's choice-of-law rules, the first step is to determine whether there is an "actual conflict" between the laws of the jurisdictions involved.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 641 (2d Cir. 2016).  If there is no conflict and New York law is among the relevant choices, the court may apply New York law but is not required to do so, and if there is a conflict, in a contract case, New York looks to the "center of gravity" or "grouping of contacts."  *See id.*; *Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 255–57 (S.D.N.Y. 2011).  "[B]arring extraordinary circumstances, only one state's law should govern an insurance agreement."  *Fireman's Fund Ins. Co.*, 822 F.3d at 643 (quoting *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 153 (2d Cir. 2003)).

Under the center-of-gravity approach, New York looks to "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *Id.* at 642 (internal marks omitted). However, where an insured risk is scattered across multiple states, as here, New York courts assess the risk as located principally in the state of the *insured's* domicile at the time the policy was issued. *Id.* Here, that state is Washington.

Additionally, under New York's choice-of-law rules, where the parties' briefs assume that a given state's law controls, such implied consent is sufficient to establish the applicable choice of law. *See Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993) (applying federal admiralty law where the parties briefed issues on that basis); *Chartwell RX, LLC v. Inmar, Inc.*, 620 F. Supp. 3d 59, 71 (S.D.N.Y. 2022) ("[W]here the parties' briefs assume that a given state's law controls, 'such implied consent . . . is sufficient to establish choice of law.'") (quoting *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014)); *Digit. Camera Int'l Ltd. v. Antebi*, No. 11-cv-01823 (MKB), 2014 WL 940723, at *3 (E.D.N.Y. Mar. 11, 2014) (applying New Jersey law where the parties' briefing relied on that law); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2013) (collecting cases).

Plaintiff squarely argued in its brief that Washington law applies to the dispute. Pl.'s Br. at 10–11. Although Defendant did not expressly consent to that assertion, nowhere in its opposition brief did Defendant dispute that Washington law applies. To the contrary, throughout its brief, Defendant cited to Washington law and argued that the application of Washington law requires a finding in its favor. *See, e.g.*, Def.'s Br. at 14–15, 25–28. For instance, Defendant argued that the Court should "disregard the non-binding cases cited by [Defendant] because they are distinguishable, and the interpretations are inapplicable. . . . None of the cited cases interpret,

analyze, or are based in Washington law." *Id.* at 30.  Defendant also referred to the law of other

states, including New York, as persuasive (not binding) authority, stating for instance that New

York law is in accord with Washington law, and that the approaches taken by "other

jurisdictions," including New York, are "reasonable" or "instructive."  *See, e.g.*, *id.* at 28 n.2, 29–

30.

       As such, Defendant's failure to raise arguments on this issue and its apparent assent to the

application of Washington law amount to a waiver of arguments regarding the applicability of the

laws of other jurisdictions, and allow for a conclusion that both parties have consented to the use

of Washington law to resolve their dispute.  Therefore, this Court will apply Washington law.

### III.    Interpretation of Insurance Policies and the Duty to Defend

       Interpretation of an insurance policy is a question of law for the courts to decide.  *See,*

*e.g.*, *Grange Ins. Co. v. Brosseau*, 113 Wash. 2d 91, 95, 776 P.2d 123, 125 (Wash. 1989) (en

banc).  "The policy is construed as a whole, and should be given a fair, reasonable, and sensible

construction as would be given to the contract by the average person purchasing insurance."  *Id.*

(internal references omitted) (quoting *Sears v. Grange Ins. Ass'n*, 111 Wash. 2d 636, 638, 762

P.2d 1141, 1142 (Wash. 1988)).  "However, where the policy language is clear and unambiguous,

[the] court will not modify the contract or create ambiguity where none exists."  *Xia v.*

*ProBuilders Specialty Ins. Co.*, 188 Wash. 2d. 171, 182, 400 P.3d 1234, 1240 (Wash. 2017) (en

banc).  "The insured bears the burden of showing that coverage exists."  *Hill & Stout, PLLC v.*

*Mut. of Enumclaw Ins. Co.*, 200 Wash. 2d 208, 217, 515 P.3d 525, 531 (Wash. 2022) (en banc)

(citing *Mut. of Enumclaw Ins. Co. v. T&G Constr., Inc.*, 165 Wash. 2d 255, 268, 199 P.3d 376,

383 (2008) (en banc)); *see also McDonald v. State Farm Fire Cas. Co.*, 119 Wash. 2d 724, 731–

732, 837 P.2d 1000, 1003–04 (Wash. 1992) (en banc); *Allstate Prop. and Cas. Ins. Co. v. Plautz*

("*Plautz*"), 659 F. Supp. 3d 1149, 1153 (W.D. Wash. 2023).

"An insurer has a duty to defend when a complaint against the insured, construed

liberally, alleges facts which could, if proven, impose liability upon the insured within the

policy's coverage." *Woo v. Fireman's Fund. Ins. Co.*, 161 Wash. 2d 43, 52, 164 P.3d 454, 459

(Wash. 2007) (en banc) (internal references omitted) (quoting *Truck Ins. Exch. v. VanPort

Homes, Inc.*, 147 Wash. 2d 751, 760, 58 P.3d 276, 281–82 (Wash. 2002) (en banc)). "Whether an

insurer has a duty to defend a complaint must be determined from the four corners of the

complaint and the four corners of the insurance policy." *Plautz*, 659 F. Supp. 3d at 1153 (internal

references omitted) (quoting *Expedia, Inc. v. Steadfast Ins. Co.*, 180 Wash. 2d 793, 806, 329 P.3d

59, 66 (Wash. 2014) (en banc)).[4] "[T]he duty to defend is triggered if the insurance policy

conceivably covers the allegations in the complaint, whereas the duty to indemnify exists only if

the policy actually covers the insured's liability." *Woo*, 161 Wash. 2d at 53, 164 P.3d at 459

(emphasis omitted). "Only if the alleged claim is clearly not covered by the policy is the insurer

relieved of its duty to defend. If the complaint is ambiguous, it will be liberally construed in

favor of triggering the insurer's duty to defend." *Truck Ins. Exch.*, 147 Wash. 2d at 760, 58 P.3d

at 282 (internal citations omitted).

---

[4] Washington courts have articulated two exceptions to this rule requiring courts to look only to
the eight corners of the complaint and policy: (1) If coverage is not clear from the face of the complaint
but coverage *could* exist (*i.e.*, there are any facts in the pleadings that could conceivably give rise to the
duty to defend), the insurer must investigate and give the insured the benefit of the doubt on the duty to
defend; and (2) if the allegations in the complaint conflict with facts that are known to or readily
ascertainable by the insurer, or if the allegations are ambiguous or inadequate, facts outside the complaint
may be considered. *Woo*, 161 Wash. 2d at 54, 164 P.3d at 459. Both exceptions favor the insured in that
the insurer may rely on facts extrinsic to the complaint only to trigger the duty to defend, not to deny it.
*Id.* Neither exception applies here, and neither party argues that the exceptions apply.

**DISCUSSION**

The relevant insurance policy provides, in part, under "Coverage A – Bodily Injury and Property Damage Liability," that Granite "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. [Granite] will have the right and duty to defend the insured against any 'suit' seeking those damages. However, [Granite] will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply . . . . This insurance applies to 'bodily injury' and 'property damage' only if . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" Exemplar Policy, Dkt. No. 44-8, at 1. The policy excludes bodily injury or property damage that is "expected or intended from the standpoint of the insured." *Id.* at 2. Thus, the policy contemplates that in order for coverage to apply under Coverage A of the policy, which is the section at issue in the parties' briefs, the damages incurred by Rainier must have occurred *because of* bodily injury or property damage, *and* that such bodily injury or property damage must have been caused by an "occurrence," under the meaning of the policy. Both conditions must be met for coverage to apply.

I.    **The Ghost Gun Lawsuits Do Not Involve an "Occurrence" Within the Meaning of the Policies**

Plaintiff first argues it is not required to defend Rainier in the Ghost Gun Lawsuits because the lawsuits do not allege harm caused by an "occurrence," as required by the insurance policies. The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Exemplar Policy, Dkt. No. 44-8, at 15. "Accident" is not defined in the policy, so this Court looks, as Washington courts do, to the ordinary, popular meaning. *See, e.g.*, *Nationwide Ins. Mut. Co. v. Hayles, Inc.* ("*Hayles*"),

136 Wash. App. 531, 537, 150 P.3d 589, 593 (Wash. Ct. App. 2007) (citing *Panorama Vill.*

*Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.*, 144 Wash. 2d 130, 139, 26 P.3d 910, 915

(Wash. 2001) (en banc)).

       Where the term "accident" is not defined in a policy, Washington courts have long held,

including in interpreting policy language regarding "occurrences" and "accidents" substantially

similar to the language at issue here, that an "accident" is "an unusual, unexpected, and

unforeseen happening." *Brosseau*, 113 Wash. 2d at 96, 776 P.2d at 125. "[A]n accident is never

present when a deliberate act is performed unless some additional unexpected, independent and

unforeseen happening occurs which produces or brings about the result of injury or death. The

means as well as the result must be unforeseen, involuntary, unexpected, and unusual." *Id.*

(internal references omitted) (citing *Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81*, 20 Wash.

App. 261, 264, 579 P.2d 1015, 1018 (Wash. Ct. App. 1978)); *see also Safeco Ins. Co. of Am. v.*

*Butler*, 118 Wash. 2d 383, 400, 823 P.2d 499, 509 (Wash. 1992) (en banc); *Detweiler v. J.C.*

*Penney Cas. Ins. Co.*, 110 Wash. 2d 99, 103, 751 P.2d 282, 284 (Wash. 1988); *Homesite Ins. Co.*

*v. Schlackman*, 671 F. Supp. 3d 1205, 1214 (W.D. Wash. 2023); *Plautz*, 659 F. Supp. 3d at 1153;

*Hayles*, 150 P.3d at 593. Thus, in determining whether an "accident" occurred, Washington

courts look to whether (1) a deliberate act was performed; and, if so, (2) whether some additional

unexpected, independent, and unforeseen happening occurred that produced the injury. The term

"accident" is not subjective in nature; the perspective of the insured is not relevant to this

inquiry. *Plautz*, 659 F. Supp. 3d at 1153 (citing *Roller v. Stonewall Ins. Co.*, 115 Wash. 2d 679,

684, 801 P.2d 207, 210 (Wash. 1990) (en banc), *overruled in part on other grounds by*

*Butzberger v. Foster*, 151 Wash. 2d 396, 89 P.3d 689 (Wash. 2004)). Washington courts have

"routinely denied coverage for intentional *acts* as a matter of law, even when the *harm* is

unintended." *Id.* at 1154 (emphasis added) (citing *Schorno v. State Farm Fire & Cas. Co.*, 2010 WL 3119449, at *5 (W.D. Wash. Aug. 3, 2010)).

### A.    The Ghost Gun Lawsuits Allege Deliberate Acts by Rainier

The term "accident" is not limited only to "an unconscious, nonvolitional act." *See Hayles*, 136 Wash. App. at 537, 150 P.3d. at 593. However, to prove that an intentional act was not an "accident," the conduct must be deliberate, "meaning done with awareness of the implications or consequences of the act." *Id.* For instance, in *Brosseau*, the Washington Supreme Court stated that where the insured had pumped a shotgun, aimed it at another person, and pulled the trigger, he deliberately fired the shotgun at the person; the fact that the insured claimed to have acted in self-defense did not "negate[] the deliberate nature of his act." *Brosseau*, 113 Wash. 2d at 97, 776 P.2d at 126; *see also Butler*, 118 Wash. 2d at 389, 823 P.2d at 499 (insured fired a gun at a truck carrying young men who had just destroyed his mailbox and one passenger was injured by a ricocheting bullet; although insured admitted firing gun towards the truck, he argued that the ricochet was unexpected and he did not intend to cause any injuries. Coverage denied because insured was experienced with firearms and ricochet was possible and foreseeable and thus not an "accident").

In contrast, in *Yakima Cement Products Co. v. Great American Insurance Co.*, the Washington Supreme Court held that where the defendant was required to pay a third party for the defendant's negligent and defective manufacture of concrete panels and the defendant had not been aware of the mis-fabrication before the panels were delivered and erected, the "unintentional and unexpected mismanufacture" was an "accident" under the defendant's insurance policy. *See* 93 Wash. 2d, 210, 215, 216, 608 P.2d 254, 255, 257 (Wash. 1980) (en banc). The fact that the insured engaged in *volitional* acts alone did not mean that an accident

did not occur; rather, an "accident" had occurred because the defendant had intended to manufacture the panels for a particular purpose, but the product unexpectedly "failed to perform the function for which it was manufactured." *See id.* at 217, 608 P.2d at 258.

Here, the complaints all allege *deliberate* conduct by Rainier under these definitions.[5] Specifically, they allege that Rainier deliberately sold and shipped unfinished frames and receivers that were easily convertible into finished frames and receivers, marketed the products as easily convertible in order to attract customers (including customers who may not otherwise be eligible to purchase firearms through lawful channels); misled customers into believing that the unfinished frames and receivers were legal workarounds to applicable laws; and sold and shipped unfinished receivers and frames without observing applicable state and federal laws and regulations intended to protect the public health and safety, such as requiring background checks, serial numbers, and the logging of sales. *See generally* NYAG Complaint; Buffalo Complaint; Rochester Complaint.

---

[5] Rainier argues that the complaints in the Ghost Gun Lawsuits refer generally to the defendants in those actions collectively, as opposed to Rainier individually. *See, e.g.*, Pl.'s Br. at 1–6, 15–16, 19–20 (arguing that the Ghost Gun Lawsuits "lump all the defendant gun manufacturers together and make general allegations attributing one defendant's actions to all the defendants. . . . [I]t is difficult to discern what allegations are intended to support which claims and which actions should be attributed to which defendants."). Rainier further argues that "[t]here are no specific allegations made against Rainier in either the Buffalo or Rochester [a]ctions." *Id.* at 6. This argument is unpersuasive. First, while each of the complaints make allegations referring to all of the defendants or groups of defendants collectively, each complaint also makes allegations that specifically name Rainier. *See, e.g.*, NYAG Complaint ¶¶ 82, 107–08, 527–60; Buffalo Complaint ¶¶ 287, 313–26; Rochester Complaint ¶¶ 295, 321–34. Furthermore, by a common-sense reading of the complaints and the application of basic English grammatical rules, many of the allegations in the NYAG Complaint properly refer to conduct by the "[d]efendants" as a whole or to "each [d]efendant," thus specifically attributing the conduct in those sentences to *all* of the defendants in those actions, including Rainier. *See generally* NYAG Complaint. The Buffalo and Rochester complaints each carefully categorize Rainier as a "Ghost Gun Defendant," *see* Buffalo Complaint ¶ 75; Rochester Complaint ¶ 75, and the complaints each refer to specific conduct by the "Ghost Gun Defendants," including Rainier. *See, e.g.*, Buffalo Complaint ¶¶ 226–471; Rochester Complaint ¶¶ 235–478. Rainier has cited no authority in support of its argument, and to adopt its position in this case would fly in the face of English grammatical rules, common sense, and common practice.

For instance, the NYAG Complaint alleges that Rainier "intentionally and repeatedly marketed, sold, and shipped unfinished frames and receivers into New York."  NYAG Complaint ¶ 106; *accord* Buffalo Complaint ¶ 226; Rochester Complaint ¶ 235.  The NYAG Complaint alleges that since Rainier's inception in 2004, it has opened a second location in Kansas "for the specific purpose of marketing and selling more efficiently to the [E]ast [C]oast," and has since "grown its New York business substantially, including its sales of unfinished frames and receivers."  NYAG Complaint ¶ 528.  In another example, the NYAG Complaint alleges: "Rainer Arms sent at least 6,428 packages into New York State between March 4, 2016, and January 5, 2023. . . . A significant portion of each group of shipments . . . contained unfinished frames and receivers."  *Id.* ¶¶ 544–47.

The NYAG Complaint further alleges that Rainier and other defendants intentionally marketed to potential customers the ease with which such unfinished frames and receivers could be converted into deadly weapons and the purported ability to do so without following applicable laws.  *See, e.g.*, NYAG Complaint ¶¶ 34, 40; *accord* Buffalo Complaint ¶¶ 231–34, 254; Rochester Complaint ¶¶ 240–43, 263.  As one example, the complaints allege that Rainier has "marketed the Freedom Wolf 80% Pistol Frame by telling consumers that it 'is not at the stage of manufacturing to meet the ATF definition on a firearm frame.  This means that this item can ship straight to your door, with no Federal Firearms License Required.  Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!'"  NYAG Complaint ¶ 82 (citing to Rainier's website); *accord* Buffalo Complaint ¶ 287; Rochester Complaint ¶ 295.  The NYAG Complaint further alleges that Rainier "continues to market unfinished frames and receivers as exempt from public safety laws to attract customers who are trying to get around gun control laws. . . .  Rainier Arms has invested heavily in

marketing designed to expand both its market share of unfinished frames and receivers and the industry, [sic] business practices that have created, maintained, or contributed to a condition that endangers the safety and health of the public."  NYAG Complaint ¶¶ 530–33.

The complaints also allege that the defendants have failed to observe applicable state and federal laws.  The complaints allege that Rainier sold unfinished frames and receivers purporting to skirt the federal definition of a "firearm," but in fact, those products do fall within the definition of a "firearm."  *See generally* NYAG Complaint; Buffalo Complaint; Rochester Complaint.  For instance, the NYAG Complaint alleges that the defendants, including Rainier, "have sold these almost-but-not-quite guns online and shipped them to New York consumers, in the full knowledge that many of these consumers cannot and should not have a deadly weapon, without applying any internal controls to verify the identity of their customer and the appropriateness of their sale."  NYAG Complaint ¶ 33; *accord* Buffalo Complaint ¶¶ 228, 237; Rochester Complaint ¶¶ 237, 246.

The NYAG Complaint further alleges that Rainier "holds a firearms [seller] license and has had ready access to the National Instant Criminal Background Check System.  However, [Rainier has not] employed that system in the course of [its] sales of unfinished framed [*sic*] or receivers to New York consumers."  *See* NYAG Complaint ¶ 75.  Nor did Rainier, per the NYAG Complaint, despite having access to various other tools that it could have used to verify whether a customer had been convicted of a crime, utilize such services in connection with its sales of unfinished frames and receivers.  *See id.* ¶ 77; *see also id.* ¶ 533 ("Consistent with its efforts to expand its market share and the industry, Rainier Arms illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State[.]").

17

Thus, the complaints in the Ghost Gun Lawsuits all allege deliberate conduct by Rainier in marketing unfinished frames and receivers in a way that encourages consumers to convert the products into working firearms and that attracts consumers attempting to skirt gun control laws, and in selling those products without observing applicable federal and state laws that are designed to mitigate the potential dangers of firearms.[6]  The complaints are devoid of any facts suggesting that Rainier's conduct was not intentional and deliberate, and Defendant does not— and cannot—cite to any such facts alleged in the complaints.  Indeed, Rainier appears to concede that "Rainier may have allegedly intentionally shipped firearms parts to New York."  Def.'s Br. at 17; *see also id.* at 23.

Rainier contends, however, that the *injuries* alleged in the Ghost Gun Lawsuits "were not purposely or deliberately intended by Rainier."  *See, e.g.*, *id.* at 15.  But even if this were true, the case law makes clear that the relevant inquiry as to whether an "accident" occurred is whether the *conduct* was deliberate, not whether the injuries that resulted were intended.  *See, e.g.*, *Butler*, 118 Wash. 2d at 401, 823 P.2d at 509 (where the claimant shot at a truck with people inside, although he claimed he did not intend to harm anyone, the conduct did not constitute an "accident" because the conduct was deliberate and the harm was foreseeable); *Hayles*, 136 Wash. App. at 537, 150 P.3d at 593 ("Intentional, wrongful acts will not qualify as accidents or 'occurrences' if the results could have been expected from the acts.") (citing *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wash. 2d 901, 906, 726 P.2d 439, 442 (Wash. 1986) (en banc)); *State Farm Fire & Cas. Co. v. Ham & Rye, L.L.C.*, 142 Wash. App. 6, 17, 174 P.3d

---

[6] Rainier provides counts for the words "deliberate," "intentional," and variations thereof in the underlying complaints and appears to argue that the words do not show up often in the complaints, and therefore the conduct at issue was not deliberate.  *See* Def.'s Br. at 15–16.  The argument, to the extent Rainier makes it, is nonsensical; the presence or absence of the relevant insurance law terms in the complaints does not determine whether the *conduct* alleged was deliberate within the meaning of that body of law.

1175, 1181 (Wash. Ct. App. 2007) ("[W]here the insured acts intentionally but claims that the result was unintended, the incident is not an accident if the insured knew or should have known facts from which a prudent person would have concluded that the harm was reasonably foreseeable.") (citing *State Farm Fire & Cas. Co. v. Parrella*, 134 Wash. App. 536, 540, 141 P.3d 643, 644–45 (Wash. Ct. App. 2006)); *Plautz*, 659 F. Supp. 3d at 1153–54; *Grange Insurance Ass'n v. Roberts*, 179 Wash. App. 739, 755, 320 P.3d 77, 87 (Wash. Ct. App. 2013) (holding that where the term "accident" is *not* defined in the insurance policy, the common law definition provides that "[w]here an insured acts intentionally but claims that the result was unintended, the incident is not an accident if the insured knew or should have known facts from which a prudent person would have concluded that the harm was reasonably foreseeable" (internal references omitted)).

Defendant points to language in *Yakima*, arguing that "'the word 'occurrence' extends to events included within the term 'accident' and also to such conditions, not caused by accident, which may produce an injury not purposely or deliberately' intended." Def.'s Br. at 15 (quoting *Yakima*, 608 P.2d at 257). This quotation is misleading; the court in *Yakima* was quoting a case from the Northern District of Mississippi to help illustrate the point that the mere fact that the claimant in *Yakima* had engaged in the *volitional* act of manufacturing concrete panels—which claimant did not know were defectively manufactured—did not mean that an "accident" had not occurred. *Yakima*, 93 Wash. 2d at 216–217, 608 P.2d at 257–58. The court "decline[d] to limit the words 'accident' and 'occurrence' to include only damage arising from the 'active malfunctioning' of the insured's product such as the breaking of a defective panel with resultant injury to a person or damage to property by its fall," and noted that "[t]he term 'accident' must be

defined in the context of the product being manufactured by the insured and the kind of losses

sustained in the event of a defect in manufacture." *Id.*  That situation is inapposite.

Defendant also argues that the NYAG Complaint contains claims for negligence and

negligent entrustment, which show that the NYAG Complaint is not limited to intentional or

deliberate conduct.  Def.'s Br. at 16–18.  Similarly, it argues that Counts 1 through 5 of the

NYAG Complaint "do not require a finding of intent," and thus they trigger the duty to defend

because "the allegations sound in negligence when construed in favor of Rainier." *Id.* at 17–18.

But just because the complaints include claims of negligence or other claims that do not require a

finding of "intent" as an element does not mean that the complaints allege non-deliberate

conduct.  "The mere fact the complaint includes the terms 'negligently' and 'reckless' does not

alter the clearly deliberate nature of the conduct alleged." *State Farm Fire & Cas. Co. v. El-*

*Moslimany*, 178 F. Supp. 3d 1048, 1057 (W.D. Wash 2016).  Where the complaint asserts legal

claims that do not require a finding of intent, courts will look to the nature of the conduct alleged

in the complaint.  *See, e.g.*, *id.* at 1056–57; *Plautz*, 659 F. Supp. 3d at 1156 (underlying

complaint brought a claim for negligence, but court found that "merely pleading negligence does

not transform a deliberate act into an accident."); *Roberts*, 179 Wash. App. at 756, 320 P.3d at 88

(underlying complaint alleged a claim of "outrage" against the insured, and insured argued that

the claim could be proven by "reckless" conduct without intending the result, the court found

that there was no "accident" because "the complaint clearly alleged deliberate actions by [the

insured]."); *Schlackman*, 671 F. Supp. 3d at 1213–14 ("mens rea requirements [in the underlying

claims] outline what [the third party] will have to prove to succeed in her suit against [the

insured] – they are not dispositive of the duty to defend. . . .  Thus, the Court focuses its inquiry

on whether the alleged facts – not the alleged causes of action – could conceivably be viewed as

20

an occurrence."); *see also El-Moslimany*, 178 F. Supp. 3d at 1057–58 (although the underlying complaint pled defamation which could be proven by mere negligent acts, finding nonetheless that the complaint alleged deliberate conduct); *Plautz*, 659 F. Supp. 3d at 1155–57 (where the underlying complaint factually alleged that the defendant knowingly hid and failed to disclose defects in selling a residence, the complaint alleged intentionality, even though the legal claim was for negligence); *Metro. Prop. Cas. Ins. Co. v. Nieto*, No. 13-05805 (RBL), 2014 WL 2987604, at *3 (W.D. Wash. July 2, 2014) (complainant sued the insured for negligence following a bar fight; finding that the conduct alleged in the complaint constituted deliberate acts so as not to be an "accident").

Here, as discussed, the complaints are devoid of facts alleging non-deliberate conduct. In the NYAG Complaint, the plaintiff's claims for negligence *per se* and negligent entrustment each "reallege[]" the allegations from the complaint (clearly describing deliberate acts), *see* NYAG Complaint ¶¶ 624, 628, and each claim includes a further description of intentional conduct. For example, the claim for negligence *per se* emphasizes that each defendant violated its duties of care imposed by various state and federal statutes "through its sale of unfinished frames and receivers into New York." *Id.* ¶ 627. The claim for negligent entrustment re-emphasizes that each defendant "intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others [and] . . . to customers intending to use them in the commission of a crime, [and that] . . . [e]ach [d]efendant's intent is demonstrated by the way each [d]efendant has emphasized the untraceability of their products in their marketing." *Id.* ¶¶ 631–33. Thus, the conduct alleged under each claim of negligence specifically underlines that Rainier engaged in intentional, deliberate conduct.

The same is true for all of the other claims that Rainier points to in its motion.  Each claim "realleges" the deliberate conduct alleged in the complaint, none present any additional facts suggesting non-deliberate conduct by Rainier, and the claims all re-emphasize various allegations of Rainier's deliberate conduct, including that Rainier and other defendants sold and shipped unfinished frames and receivers, marketed their products, and misled consumers. NYAG Complaint ¶¶ 596–623; *see also* Buffalo Complaint ¶¶ 505–73; Rochester Complaint ¶¶ 511–79; *see also Granite State Ins. Co. v. Primary Arms, LLC*, 23-cv-07651 (LGS), 2024 WL 4008167, at *4 (S.D.N.Y. Aug. 30, 2024) (in an action by another Ghost Gun defendant against Granite, finding that the alleged conduct does not constitute an "accident") (applying Texas law to the same complaints).

Finally, Rainier argues that the allegations of the Ghost Gun Lawsuits fall within the "products-completed operations hazard" provisions of the insurance policies,[7] which, Rainier argues, specifically comprehends the intentional sale of Rainier's products; thus, Rainier argues that the insurance policies were "designed to cover lawsuits alleging injury or damage [later] caused by products that Rainier 'intentionally' or 'deliberately' sold or marketed."  Def.'s Br. at 2, 9–10, 20–21.

To the extent Rainier is arguing that the "products-completed operations hazard" provisions are rendered illusory by the application of Washington's two-part test for whether an

---

[7] The relevant insurance policies include various aggregate limitations for coverage for specified sums under the policy; the policies state that the "Products-Completed Operations Aggregate Limit is the most [Granite] will pay under Coverage **A** for damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.'"  Exemplar Policy, Dkt. No. 44-8, at 11 (boldface in original).  The policy defines "products-completed operations hazard," in part, to "include[] all 'bodily injury' and 'property damage' occurring away from premises [the insured] own[s] or rent[s] and arising out of '[the insured's] product' or '[the insured's] work' except: (1) Products that are still in [the insured's] physical possession; or (2) Work that has not yet been completed or abandoned."  *Id.* at 15.

"accident" has occurred, this argument holds no merit.  As noted above, Washington's two-part

test first requires courts to determine if the conduct was deliberate.  If so, there is no "accident"

unless some additional unexpected, independent, and unforeseen happening occurs that brings

about the harm.  If some non-deliberate conduct arising out of Rainier's deliberate sales caused

injury, such as an unintended defect in the product that caused it to explode in the user's hand

rather than expelling a projectile, that instance might fall within the meaning of "occurrence."

*See* Reply at 9 & n.3; *see also Yakima*, 93 Wash. 2d at 215–16, 608 P.2d at 257–58 (finding an

"accident" under the insurance policy with respect to claimant's negligent and defective

manufacture of concrete panels).  But here, Rainier's alleged conduct was deliberate, for the

reasons described above, and the harms alleged did not occur as a result of some additional

unexpected, independent, and unforeseen happening.  Thus the policy terms do not take it outside

of Washington's two-part test, nor change the conclusion that Granite has no duty to defend.

      To the extent Rainier argues that the "products-completed operations hazard" provisions

of the policy actually cover the allegations in the Ghost Gun Lawsuits, some of the very cases

Rainier cites—which explain that the provisions apply where "the injury . . . arise[s] out of a

defect in the insured's product or work"—show that these provisions do not apply here.  *See*

Def.'s Br. at 9 (citing *Allstate Ins. Co. v. Liberty Surplus Ins. Corp.*, 154 Wash. App. 1042 (Ct.

App. 2010)); *cf. Goodwin v. Wright*, 100 Wash. App. 631, 635, 6 P.3d 1, 4 (Wash. Ct. App. 2000).

The complaints in the Ghost Gun Lawsuits are devoid of allegations related to defective

products, and Defendant makes no arguments that they include such allegations.  Nor does

Defendant proffer any other arguments as to why the "products-completed operations hazard"

provisions apply.  *See generally Hill & Stout, PLLC*, 200 Wash. 2d at 218, 515 P.3d at 531 (the

insured bears the burden of showing that coverage exists); *McDonald*, 119 Wash. 2d at 729–30, 837 P.2d at 1003–04; *Plautz*, 659 F. Supp. 3d at 1153.

For the reasons explained above, the Ghost Gun Lawsuits clearly allege that Rainier engaged in deliberate conduct.

### B.    The Alleged Conduct Does Not Include Any Additional Unexpected, Independent, and Unforeseen Happening

Even though the Ghost Gun Lawsuits allege deliberate conduct by Rainier, Granite could still have a duty to defend if the deliberate conduct resulted in an unforeseen happening. *See, e.g.*, *Butler*, 118 Wash. 2d at 401, 823 P.2d at 509. An "accident" may exist where an intentional act results in something that "no reasonable mind . . . under the circumstances" could have foreseen. *Ham & Rye, L.L.C.*, 142 Wash. App. 16, 174 P.3d at 1180 (citing *Hayles*, 136 Wash. App. at 537, 150 P.3d at 594). "All that is required is that the claimant know or should know facts from which a prudent person would conclude that the injurious consequences are reasonably foreseeable." *Schlackman*, 671 F. Supp. 3d at 1214 (quoting *Lloyd v. First Farwest Life Ins. Co.*, 54 Wash. App. 299, 302, 773 P.2d 426, 428 (Wash. Ct. App. 1989)).

For instance, in *Detweiler*, the claimant had fired six bullets from point blank range at the rear wheel and tire of his pickup truck as another individual attempted to drive away with it; the bullets fragmented, and claimant's face and neck were spattered with the fragments. 110 Wash. 2d at 101, 751 P.2d at 283. In the ensuing insurance coverage dispute, the Washington Supreme Court, in deciding whether the injuries were caused by an "occurrence" (*i.e.* an "accident"), held that though the conduct was intentional, and although the bullets did arguably precisely what bullets fired at high velocity do when they hit steel, under the specific and unique facts of the case, reasonable minds could disagree whether an additional, unexpected, independent, and unforeseen happening brought about the injuries. *Id.* at 104–109, P.2d at 285–87.

In so holding, the court emphasized the unique facts of that case, including that the claimant had served in the Army for two years, at which time he was a helicopter door gunner and trained in the use of certain firearms; had taken a hunting education course three times; had practiced with the firearm he used during the encounter in question; and was familiar with the target, a pickup truck that he owned, drove to work, and used for hunting. *Id.* at 107, P.2d at 286. The court acknowledged that one could reasonably find that the injuries were a natural consequence of deliberate conduct, but given the facts that the truck was rapidly moving and considering the claimant's experience, reasonable minds could disagree. *Id.* at 108–109, P2d at 286–87.

In contrast, in *Brosseau*, where the claimant shot at a third party, the Washington Supreme Court found that the third party's resulting death was foreseeable, contrasting the case to *Detweiler* and noting that "nothing in the record even remotely suggests that any additional unexpected, independent and unforeseen happening occurred which caused [the] death." 113 Wash. 2d at 96–97, 776 P.2d at 126.

And in *Butler*, the claimant saw two people emerge from a truck and fired numerous shots at the truck; he kept firing after the people re-entered the truck and started to drive away, and one of the shots struck an individual in the head. 118 Wash. 2d at 386, 823 P.2d at 502. Although the claimant claimed that the ricochet that struck the third party was unintentional—a fact that the court assumed true for the purposes of its review—the Washington Supreme Court found that "no reasonable person could reach the conclusion that [the] injury was unforeseeable." *Id.* at 401, P.2d at 509. The court noted that the claimant had been trained by the Air Force and the Oakland Police Department, had belonged to a pistol range where he practiced once a month, and had intentionally fired at an occupied truck. *Id.* The court concluded that "no reasonable

person could conclude [he] was unaware of the possibility of ricochet, or that the ricochet might hit an occupant of the truck." *Id.*

Here, no reasonably prudent person could find that the harms alleged were unforeseeable—certainly not to an experienced firearms retailer like Rainier—and nothing in the record suggests that any additional unexpected, independent, and unforeseen happening occurred which caused the particular harms alleged in the Ghost Gun Lawsuits. The complaints allege that Rainier's business practices have contributed to an influx of ghost guns, which have diminished the effectiveness of legal protections designed to mitigate danger from firearms, increased the number of firearms likely to be used in crimes, and made it more difficult for law enforcement to solve such crimes. *See, e.g.*, NYAG Complaint ¶¶ 1, 54–55, 543, 574–595; Buffalo Complaint ¶¶ 456–82; Rochester Complaint ¶¶ 464–88. In doing so, the complaints allege, Rainier has attempted to skirt state and federal laws that were designed to mitigate the risk that firearms will be used in connection with crimes, and to enable law enforcement to more readily solve such crimes when they do occur. *See, e.g.*, NYAG Complaint ¶¶ 1, 54–55, 543, 574–93; Buffalo Complaint ¶¶ 456–82; Rochester Complaint ¶¶ 464–88.

As an example, the NYAG Complaint alleges that the defendants' "sale of unfinished frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public. Research indicates that comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws. . . . But by their conduct, [the d]efendants are nullifying those benefits. [The d]efendants are stripping New York's effective licensing and permit laws of their impact, and consequently the number and rate of homicides and suicides will continue to rise." *See, e.g.*, NYAG Complaint ¶¶ 592–93.

26

The complaints allege that the defendants, including Rainier, "have sold these almost-but-not-quite guns online and shipped them to New York consumers, *in the full knowledge that many of these consumers cannot and should not have a deadly weapon*, without applying any internal controls to verify the identity of their customer and the appropriateness of their sale." *Id.* ¶ 33 (emphasis added); *accord* Buffalo Complaint ¶ 237; Rochester Complaint ¶ 246. The complaints further allege that the defendants "are aware that persons who have been convicted of felonies are an important segment of the gun industry market," and that they "exacerbate the challenges New York has in preventing illegal firearms from entering [] communities by providing criminals and other individuals who either know or suspect they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one that is virtually untraceable." NYAG Complaint ¶ 589; *accord* Buffalo Complaint ¶ 475; Rochester Complaint ¶ 482.

The Buffalo and Rochester Complaints state that the City of Buffalo and the City of Rochester are "experiencing the entirely predictable result of [the d]efendants' lawless behavior: exponentially increasing numbers of firearms, including untraceable ghost guns used in crimes[,] . . . including multiple murders and other crimes of violence, often committed by persons who could never legally acquire a conventional firearm in the first place." Buffalo Complaint ¶ 37; Rochester Complaint ¶ 36; *see also* Buffalo Complaint ¶ 512 ("[I]t was foreseeable to [the d]efendants that such an unlawful and unreasonable business and marketing practices would lead to easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.").

Based on the allegations, if proven, Rainier acted with the knowledge and intention that the unfinished frames and receivers it sold and shipped would be used to create functioning deadly weapons (and indeed advertised its products as such). By deliberately selling unfinished

receivers and frames that are easily convertible into deadly weapons, actively marketing them as such to persons who might not be able to buy firearms from licensed firearms dealers, and doing so intentionally without observing applicable state and federal laws that mitigate the risks of firearms from falling into the hands of dangerous persons and that better enable law enforcement to trace such weapons back to their owners, Rainier allegedly knew that it created a greater risk that its products could facilitate and be used in dangerous or criminal activity.  Rainier also allegedly acted with the knowledge that it would be more difficult for law enforcement to trace the resulting, un-serialized "ghost guns" if they were used in connection with crimes.

Thus, no reasonable person could find that Rainier could not have foreseen that its alleged deliberate conduct could lead to the harms alleged by the plaintiffs in the Ghost Gun Lawsuits, including an increase in the market for ghost guns, an increase in the use of ghost guns in connection with crimes, and the necessitated increased government expenditure of law enforcement resources and public health resources, including various expenditures for the abatement of the harms caused by Rainier's alleged conduct.  *See, e.g.*, *Burns Towing, Inc.*, 2019 WL 2548689, at *1–4 (the Washington Attorney General sued the defendant towing company, which had contracts to tow and impound unauthorized motor vehicles and which would sell the vehicles at public auction after notice to the owner of record, including some vehicles belonging to active duty servicemembers in violation of state law; the court found that depriving owners of possession of their vehicles was the natural consequence of selling a vehicle at auction); *see also Aiu Ins. Co. v. McKesson Corp.*, No. 22-16158, 2024 WL 302182, at *4 (9th Cir. Jan. 26, 2024) (applying California law, which has a similar common law definition of "accident," the court found that where the underlying complaint alleged the insured had intentionally oversupplied and pushed opioids on a massive scale, "[i]t is simply not credible that when doctors prescribed the

drugs McKesson allegedly pushed, when pharmacists filled those prescriptions with the drugs McKesson distributed, and when end users became addicted to those drugs, overdosed, resorted to heroin, and died, that was a mere 'matter of fortuity.'").  Here, too, it is simply not credible that—when consumers bought unfinished receivers and frames and converted them into functioning firearms (as sold and shipped by Rainier and in accordance with Rainier's marketing), when the resulting firearms were untraceable ghost guns that did not contain serial numbers and were not logged in appropriate databases (as deliberately facilitated by Rainier), and when Rainier conducted no background checks in contravention of laws designed to mitigate risks from firearms and failed to observe other legally required gun control measures—the government would not foreseeably need to expend additional resources on mitigating the resulting harms.  *See id.,* 2024 WL 302182, at *4.

Accordingly, the harms alleged in the Ghost Gun Lawsuits were not "caused by an occurrence" within the meaning of the policies or Washington law.  Defendant has not met its burden of proving coverage and thus showing that Plaintiff has a duty to defend it under the relevant insurance policies.  Further, because Granite has no duty to defend Rainier in the Ghost Gun Lawsuits, it did not breach its insurance contract with Rainier by failing to defend Rainier. As such, Plaintiff's motion for partial summary judgment on Count I of its Complaint—for declaratory judgment that it is not obligated to defend Rainier in the Ghost Gun Lawsuits—as well as on Counts I and II of Defendant's Counterclaims—for breach of contract under the relevant insurance policies due to Granite's failure to defend Rainier in the Ghost Gun Lawsuits and for declaratory judgment that Granite must pay for Rainier's defense in the Ghost Gun Lawsuits—is GRANTED.  Accordingly, Defendant's cross-motion for partial summary judgment on Count I of its Counterclaims is DENIED.

II.    **"Because of" Bodily Injury or Property Damage**

Plaintiff further argues that it is not obligated to defend Rainier in the Ghost Gun Lawsuits because the lawsuits do not seek damages "because of" bodily injury, as required by the relevant policies.  *See* Pl.'s Br. at 21–25.  Defendant disagrees and further argues that the Ghost Gun Lawsuits also allege and seek damages "because of" property damage, within the meaning of the policies.  Def.'s Br. at 25–32.

Because this Court finds that the Ghost Gun Lawsuits do not allege harm caused by an "occurrence," the Court need not reach this issue to resolve the motions.

III.    **Defendant's Application for Attorneys' Fees and Costs**

Defendant also argues that if this Court determines that Plaintiff owes it a duty to defend, it is also entitled to attorneys' fees incurred in this coverage action.  Def.'s Br. at 33–34; *see also Olympic Steamship Co., Inc. v. Centennial Ins. Co.*, 117 Wash. 2d 37, 53, 811 P.2d 673, 681, (Wash. 1991) (en banc) ("[A]n award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract[.]").

Because this Court grants Plaintiff's motion for partial summary judgment and denies Defendant's cross-motion for partial summary judgment, Defendant's requests for attorneys' fees is DENIED.  *See Speed*, 179 Wash. App. at 204, 317 P.3d at 543 (where the claimant was not the prevailing party, he was not entitled to fees under *Olympic Steamship*); *Roberts*, 179 Wash. App. at 775, 320 P.3d at 97.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is

**GRANTED**, and Defendant's cross-motion for partial summary judgment and for attorneys' fees

is **DENIED**.  The Clerk of Court is directed to terminate Dkt. Nos. 41 and 46.

Dated:  March 27, 2025
        New York, New York

                                        SO ORDERED.


                                        _____
                                        MARGARET M. GARNETT
                                        United States District Judge